1:26-mj-50-AEM

**AFFIDAVIT**

I, Nicholas Nunes, Task Force Officer with the US Department of Homeland Security, Homeland Security Investigations ("HSI"), having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of:

   a. a criminal complaint and arrest warrant for JOSEPH L. MELLO III YOB: 1988 ("MELLO") for violations of 18 U.S.C. §§ 2251(a), 2251(e) - Attempted Production of Child Pornography (Count 1);[1] 18 U.S.C. § 2252A(a)(2) – Receipt of Child Pornography (Count 2); [2] 18 U.S.C. § 2252A(a)(5) – Possession of and Access with Intent to View

[1] 18 U.S.C. § 2251(a) provides: (a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, . . . .

As used in 18 U.S.C. § 2251(a), under 18 U.S.C. § 2256(2)(A), "sexually explicit conduct" means "actual or simulated— (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii)bestiality; (iii)masturbation; (iv)sadistic or masochistic abuse; or (v)lascivious exhibition of the anus, genitals, or pubic area of any person. . . ."

[2] 18 U.S.C. § 2252A(a)(2) provides: (a) Any person who knowingly receives . . . — (A) any child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or (B) any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

Child Pornography (Counts 3 and 4);[3] 18 U.S.C. § 1466A(a) – Production of Obscene Visual Representations of the Sexual Abuse of Children (Count 5);[4] (the SUBJECT

---

The term "child pornography" as used in 18 U.S.C. § 2252A is defined at 18 U.S.C. § 2256(8) as any visual depiction, including any photograph, film, video, picture, *or computer or computer-generated image or picture*, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where— (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) *such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct*; or (C) *such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.* (emphasis added)

[3] 18 U.S.C. § 2252A(a)(5) provides: (a) Any person who—(5). . .(B) knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; . . . shall be punished as provided in subsection (b).

[4] 18 U.S.C. § 1466A(a) provides: (a) In General.—Any person who, in a circumstance described in subsection (d), knowingly produces, distributes, receives, or possesses with intent to distribute, a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that—

(1) (A) depicts a minor engaging in sexually explicit conduct; and (B) is obscene; or

(2) (A) depicts an image that is, or appears to be, of a minor engaging in graphic bestiality, sadistic or masochistic abuse, or sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; and
(B) lacks serious literary, artistic, political, or scientific value; or attempts or conspires to do so, shall be subject to the penalties provided in section 2252A(b)(1), including the penalties provided for cases involving a prior conviction.

(d) Circumstances.—The circumstance referred to in subsections (a) [and (b)] is that—
(1) any communication involved in or made in furtherance of the offense is communicated or transported by the mail, or in interstate or foreign commerce by any means, including by computer, or any means or instrumentality of interstate or foreign commerce is otherwise used in committing or in furtherance of the commission of the offense;

OFFENSES); and

b. an application for a search warrant for the person of MELLO, YOB 1988, (MELLO or the SUBJECT PERSON) and the content of any electronic media storage devices or media located on the SUBJECT PERSON, as more fully described in Attachment A to seize and search for evidence, instrumentalities, and fruits of violations of the SUBJECT OFFENSES, which items are described in Attachment B, pursuant to Fed. R. Cr. P. 41. Attachments A and B are incorporated herein by reference.

2. I am a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations and have been since October of 2025. I have been a Police Officer within the Town of Lincoln, RI since December of 2016. I have served in the rank of Detective since August of 2022. In October of 2025, I was assigned to Homeland Security Investigations and was designated as a Title 19 Task Force Officer. I am currently assigned to conduct investigations in the HSI Providence Office.

3. In accordance with 19 U.S.C. § 1589a, Task Force Officers are Federal Law Enforcement Officers and are authorized to enforce the full range of federal law including violations of other titles of the United States Code, including but not limited to Title 18 and Title 31. I am a "Federal Law Enforcement Officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am also an Investigative or Law Enforcement Officer of the United States within

---

(2) any communication involved in or made in furtherance of the offense contemplates the transmission or transportation of a visual depiction by the mail, or in interstate or foreign commerce by any means, including by computer;

. . .

(4) any visual depiction involved in the offense has been mailed, or has been shipped or transported in interstate or foreign commerce by any means, including by computer, or was produced using materials that have been mailed, or that have been shipped or transported in interstate or foreign commerce by any means, including by computer . . . .

the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code.

4. In connection with my official duties, I am authorized to and have investigated, as well as assisted other agents in investigating, criminal violations relating to child exploitation, child pornography, coercion and enticement, including but not limited to, violations of 18 U.S.C. §§ 1466A, 2422, 2251, 2252, and 2252A. I have received training in the investigation of internet crime, child exploitation, and child sexual abuse, and have observed and reviewed examples of child pornography (as defined in 18 U.S.C. § 2256) (aka "CSAM").

5. As will be shown below, there is probable cause to believe that:

a. MELLO, using a computer, specifically, his cell phone, attempted to surreptitiously or secretly photograph and/or video Minor Victim 1 (MV1) while she was in an area used for toileting and undressing, and thereby attempted to use MV1 to produce a visual depiction of MV1 engaged in sexually explicit conduct, to wit, the lascivious display of her anus, genitals, and/or pubic area, in violation of 18 U.S.C. § 2251(a) and (e);

b. MELLO, using various artificial intelligence provider platforms, created and received child pornography, specifically, computer generated images and/or videos that were created or modified to appear that an identifiable minor was engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252A(a)(2);

c. MELLO knowingly possessed, or knowingly accessed with intent to material that contained images and videos of child pornography, including of a prepubescent minor -- specifically, computer generated images and/or videos that were created or modified to

appear that an identifiable minor was engaging in sexually explicit conduct *and* known images of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and

d. MELLO produced and received visual depictions that were or appeared to be of real minors engaged in sexual intercourse, and that lacked serious literary, artistic, political, or scientific value, in violation of 18 U.S.C. § 1466A(a).

6. The information contained in this affidavit is based on witness interviews, conversations with investigators from multiple agencies/departments involved in this investigation, my personal knowledge, and observations during the course of this investigation, my personal training and experience as a criminal investigator, and the review of records, documents and other evidence obtained during this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the warrant requested herein.

## DEFINITIONS AND BACKGROUND INFORMATION

7. Artificial Intelligence ("AI"): In general terms, as used in this Affidavit, AI refers to the ability of computer systems to perform tasks that have traditionally required human intelligence—such as understanding language, reasoning, analyzing and learning from data, answering questions, solving problems, and generating content.

8. Prompt: A "prompt" is the input a user gives the AI provider to tell it what to do and guides the AI provider's response.

9. Generative Pre-Trained Transformers ("GPTs"): GPTs are a type of neural network architecture widely used in modern AI. GPTs are trained on massive amounts of data in a

process called pre-training, which helps them learn language patterns, structure, and meaning. This pre-training allows them to generate human-like text and respond to user input intelligently. Commonly known companies such as Open AI and Anthropic develop their own GPT-like models, which power chatbots such as, respectively, ChatGPT and Claude. These chatbots can generate realistic text, and in some cases, images, based on prompts provided by users. This makes them useful for tasks such as content generation, language translation, summarization, and interactive conversations.

10. SwapX Pro: SwapX Pro is an AI powered application developed by SprayJoy Limited, a Hong Kong based entity. The SwapX application's website -- "swapx.sprayjoy.com" -- describes the app as follows: "AI helps you change your face, clothes, and body..." Amongst other image/video editing features on the website, an "AI Video Animator" is described as: "Animate static photos into dynamic scenes (hugging, dancing, kissing) with customizable templates—add motion to memories effortlessly."

11. Grok: Grok, is a conversational generative AI program, created and hosted by SpaceXAI LLC is a US-based company and powered by SpaceXAI LLC's large language models." Grok can be accessed via the web address "Grok.com" or by downloading the mobile phone application of the same name. Grok's ability to create, edit, and generate media is defined in the "Grok Imagine" section of the webpage ("x.ai/api/imagine"). When defining how Grok's "Imagine" abilities are able to create media files when prompted by the user, the website states: "From prompt to pixel-perfect reality. State-of-the-art image and video generation, editing, and restyling." The website details capabilities Grok has with media generation, such as "virtual try-on" where a user can manipulate an image of a person's clothing and appearance by uploading "a photo of a person and a clothing item - the API [(Grok Imagine)] generates a video of them

wearing it." The user can then enter text prompts and descriptions on how to manipulate the photo or video in question, as well as turn uploaded photos into AI-generated videos using these methods. Examples of these Grok capabilities are displayed on the website. Grok can generate human-like text or images based on prompts from users, making them valuable for tasks such as deep research, language translation, content generation, and conversational interfaces. Grok creates a record of prior conversations that assists its GPT models in learning from user interactions.

12. Canva: Canva is a graphic design platform that is owned by Canva Pty Ltd, an Australian technology company.

13. AIFaceSwap: The website "aifaceswap.io" has the headline "Swap Face with AI Online" with the description "Enjoy the fun of AI face swapping online by simply uploading your photo. It's free and requires no login. No watermarks on AI face swap image." In a field on the homepage, it has two sections to upload images, one for the "Original Image" and another for the "Face Image." The website shows example images in which faces are realistically swapped from an example face image to the final image. An additional description states "Transform into anyone you desire," "With our AI face swap online tool, you have the power to transform into anyone you desire. Whether it's swapping faces with your favorite celebrity, your pet, or even your best friend, the possibilities are endless. Simply upload your photo and watch as our advanced technology seamlessly swaps your face with the chosen one, creating hilarious and entertaining results."

14. OpenGoon: The OpenGoon website contains a headline of "The coolest all-in-one NSFW tool" (NSFW stands for Not Safe For Work, which, I know through my training and experience, commonly references pornography). A lower section on the website titled "What is OpenGoon?"

describes the website in the following way: "OpenGoon is an AI tool designed to create adult content from your own images, quickly and with minimal setup. You can turn a photo into a short realistic video, generate a nude version, or apply X-ray-style transformations. The process is simple: choose a mode, upload an image, and let the system handle the rest. OpenGoon is for adults only: use only your own photos or image you have clear permission to use; images of minors and celebrities are not allowed." The website then shows various examples of how its AI can create "image to video" files to "create a high-quality realistic sexy video," use "Xray" to "upload a photo and see through the clothes," and "image to nude" to "upload a selfie or photo and generate a realistic high-quality nude, in just a few seconds."

15. Google: Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

## PROBABLE CAUSE

*Report of Surreptitious Recording at [redacted] Lincoln, RI*

16. On April 4, 2026, Lincoln Police Department (LPD) Officers responded to [redacted] in Lincoln, Rhode Island ([redacted]) and interviewed the School Director, [redacted], about an incident that had occurred at [redacted] on April 3, 2026, involving a 12-year-old female student referred to as Minor Victim 1 ("MV1"). [redacted] reported that MV1 had been changing in a bathroom at [redacted] and heard a noise from the window of the bathroom. When

MV1 looked up to the window, she said she saw what she thought was a cell phone pressed against the window. MV1 said that when she heard the noise, she was unclothed from the waist up.

17. During the investigation, I learned and personally observed that the room at [redacted] in which MV1 was changing was a small room used by all members of the [redacted] school that contained a toilet and functioned as a bathroom and changing room. As described herein, further investigation identified MELLO as the person believed to be outside the bathroom window, taking a photograph and/or video, at the time of the incident reported by MV1. From my training and experience, and my work on this investigation, I believe that MELLO was attempting to secretly or surreptitiously photograph and/or video MV1 (and potentially other minors) while they were changing in and/or using the bathroom in an attempt to obtain images and/or videos of them in a state of undress.[5]

[5] From my training and experience and information provided by representatives of the US Attorney's Office, I am also aware that an attempted production of child pornography charge only requires the government to prove beyond a reasonable doubt that defendant intended to produce a lascivious video or image (or other image or video that meets the statutory definition of child pornography) and that he took a substantial step to do so. *See United States v. McKenzie*, 178 F. 4th 74, 83-84 (1st Cir. 2026); *United States v. Saldaña-Rivera*, 57 F.4th 977 (1st Cir. 2019).

I am also aware that a person surreptitiously recording or photographing a minor, even if the minor is engaged in otherwise innocent activity, can be conduct that constitutes actual or attempted violation of 18 U.S.C. § 2251, and the images or videos created could constitute child pornography. *See United States v. Moran*, 57 F.4th 977, 985 (11th Cir. 2023) (defendant who entered an online "mom blog" and made unsuccessful requests for users to produce and post sexually explicit videos of their children was guilty of attempted production of child pornography); *United States v. Vallier*, 711 F. App'x 786, 788 (6th Cir. 2018) ("Courts have repeatedly upheld convictions under § 2251(a) where the defendant, with lascivious intent, secretly videoed minors engaged in otherwise innocent activities such as undressing to change clothes or take a shower."); *United States v. Miller*, 829 F.3d 519, 524-26 (7th Cir. 2016) (holding that videos taken of a minor nude in the shower and sometimes undressing prior to showering support a finding of lasciviousness; noting that showers and bathtubs are frequent hosts to fantasy sexual encounters as portrayed on television and in film) (citation and quotation

18. I have also learned that MELLO and his wife attended classes at [redacted] and that MELLO had also been a performer in various performances at [redacted].

19. On April 29, 2026, two female members of [redacted] came to the LPD to report their past concerns with MELLO while attending classes at the [redacted] towards the end of 2025. They each stated they previously discovered MELLO's coat hanging on the door inside the bathroom during classes. I note that this is the same bathroom in which MELLO surreptitiously photographed MV1. Reportedly, MELLO's coat was hung with his phone positioned to be partially out of the pocket with the phone camera pointed to view the bathroom. Finding this to

---

omitted); *United States v. Holmes*, 814 F.3d 1246, 1251-52 (11th Cir. 2016) (holding "[t]oday, we join the Eighth, Ninth, and Tenth Circuits and hold that a lascivious exhibition may be created by an individual who surreptitiously videos or photographs a minor and later captures or edits a depiction, even when the original depiction is one of an innocent child acting innocently."); *United States v. Sims*, 708 F.3d 832, 835 (6th Cir. 2013) (holding that non-lascivious videos supported a charge of attempted production of child pornography). *See also United States v. Thompson*, No. 1:24-cr-10107-JEK, 2024 WL 5159863 (D. Mass. December 18, 2022) (denying motion to dismiss indictment alleging attempted sexual exploitation of a minor in violation of 18 U.S.C. § 2251, which alleged surreptitious recording); *United States v. Quintana Cruz*, Crim. No. 22-417 (ADC), 2024 WL 2956377, at n 3 (D.P.R. June 12, 2024) (denying motion to dismiss indictment alleging attempted violation of 18 U.S.C. § 2251(a), finding that "[a]ctual images or videos, whether sexually explicit or not, are not required to prove a charge of attempted production of child pornography")

I am also aware that "sexually explicit conduct," as used in 18 U.S.C. § 2251, is defined at 18 U.S.C. § 2256(2) and includes "(v) lascivious exhibition of the anus, genitals, or pubic area of any person." I also know that the factors from *United States v. Dost*, 636 F. Supp. 828, 832 (S.D.Cal. 1986) are often used to assess if any image or video is lascivious: (1) whether the genitals or pubic area are the focal point of the image; (2) whether the setting of the image is sexually suggestive (i.e., a location generally associated with sexual activity); (3) whether the child is depicted in an unnatural pose or inappropriate attire considering her age; (4) whether the child is fully or partially clothed, or nude; (5) whether the image suggests sexual coyness or willingness to engage in sexual activity; and (6) whether the image is intended or designed to elicit a sexual response in the viewer. *United States v. Vallier*, 711 F. App'x 786, 788 (6th Cir. 2018) ("Courts have repeatedly upheld convictions under § 2251(a) where the defendant, with lascivious intent, secretly videoed minors engaged in otherwise innocent activities such as undressing to change clothes or take a shower.").

be unusual, they alerted MELLO to remove his coat from the room; however, no further action or review of the phone was conducted at the times these instances occurred.

*State and Federal Search Warrants*

20. On April 13, 2026, Magistrate Alan R. Goulart issued a Rhode Island State search warrant authorizing the search of Joseph MELLO and his prior North Smithfield, RI residence for evidence of Video Voyeurism in violation of Rhode Island General Law (RIGL) § 11-64-2.[6] The RI state search warrant was executed on April 15, 2026, and law enforcement seized eleven electronic devices, including a Samsung cell phone.[7]

21. On April 15, 2026, during the state search warrant execution, I read MELLO his *Miranda* Rights and interviewed MELLO at the kitchen table of his residence. The interview was video-recorded. In summary, while being interviewed, MELLO confessed to using his phone to view and to record MV1 in the bathroom on April 3, 2026. MELLO claimed, however, that he already deleted any recordings of MV1 from the night of the incident, stating "anything that I did record I deleted". When asked why he filmed through the window, MELLO stated he takes these videos for the thrill and for sexual gratification. He further stated he has a "history from when I was a child of doing that kind of thing to [redacted]." During the interview, MELLO also willingly

---

[6] I note that during the execution of the state search warrant executed on MELLO's person and/or residence, two Samsung cell phones were located: Samsung Cell Phone (IMEI # 355552517528544), which has been referred to in a prior affidavit as SUBJECT DEVICE 1, and Samsung Cell Phone (Damaged) (IMEI # 35579646723668), which has been referred to as SUBJECT DEVICE 2 in a prior affidavit. Within this Affidavit, when I discuss the Samsung cell phone, I am referring to Samsung Cell Phone (IMEI # 355552517528544), previously referred to as SUBJECT DEVICE 1, and his primary personal Samsung cell phone.

[7] As the investigation continued, on July 24, 2026, investigators obtained a federal search warrant (Case No. 26-SW-201-PAS) to search items seized from MELLO's person and/or residence, to include a Samsung cellular telephone.

signed a Consent to Search form, in which he consented to the search of all computers, cellular telephones, any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripheral which MELLO owns, possesses, controls, and/or has access to. MELLO also provided passwords he was able to recall for many of his electronic devices, as well as the secure folder on a Samsung cell phone, that MELLO identified as his primary personal cell phone.

22. With respect to what would be found on his cell phone (the Samsung cell phone), MELLO told investigators that pornography would be located on his phone, such as images of his wife and porn history. MELLO stated he also creates AI-generated porn and stores such media files on his phone. MELLO stated that the created media are oral sex videos. MELLO denied that they pertained to minors, stating that "none of them are real." When asked if the depicited individuals in the videos are under the age of 18, MELLO responded, "I guess you could consider some of them."

23. During the interview, MELLO said that he created AI-generated "pornography" using the SwapX AI and Grok applications. From my training and experience and my work on this investigation, I have learned that SwapX AI and Grok are AI applications allow users to create AI-generated images and videos using existing photos and videos. As described herein, I am aware of other AI provider platforms that offer similar services, including other platforms used by MELLO.

24. After his interview, MELLO was placed under arrest and charged with Video Voyeruism in violation of RIGL § 11-64-2 and was transported to the LPD Headquarters.

25. On April 15, 2026, one of the devices seized pursuant to the state Warrant (MELLO's primary personal Samsung cell phone) was transferred to the custody of the Rhode Island State

Police (RISP) Computer Crimes Unit for assistance in extracting the data from the phone. On April 27, 2026, I received the phone back, along with a USB flash drive containing MELLO's extracted phone data from MELLO's Samsung cell phone.

26. On April 20, 2026, MELLO contacted me via telephone at the LPD. On a recorded LPD telephone line, MELLO inquired about his devices (that were seized during the April 15, 2026 execution of the RI state Warrant) and asked if his work phone and a laptop could be released, stating those devices "should be clean".

*Findings From Review of MELLO's Samsung Cell Phone*

27. The review of MELLO's Samsung cell phone conducted to date has shown that MELLO has used various AI applications, including SwapX, Grok, Canva, AI Face Swap, and Opengoon.com, to edit / alter non-CSAM images and videos of real prepubescent minors, that appear to have been taken by MELLO. Using the AI tools and the existing images and videos of real minors, MELLO produced CSAM images and videos that depict these real, identified children engaging in sexually explicit conduct, including sexually explicit conduct with him (MELLO). In addition to the images and videos of child pornography produced / created by MELLO, I have also identified child pornography that that are "known" images of child pornography.[8]

28. In my review of the Samsung cell phone, I have identified images of real children, including MV1, who were photographed and/or videoed by MELLO, and which appear to have been taken at [redacted], the [redacted] in

[8] A "known" image or video is an image or video that has previously been identified, analyzed, and cataloged by law enforcement or organizations such as the National Center for Missing & Exploited Children (NCMEC).

Lincoln, RI; [redacted] in Seekonk, MA; and [redacted] in Smithfield, RI. At the time of his arrest in April 2026, MELLO was employed as a gymnastics instructor at [redacted] in Seekonk and an instructor at [redacted]. He was previously employed as an instructor at [redacted]. In his capacity at all of these organizations, MELLO worked with minors, including prepubescent minors, and had close contact with and hands-on contact with prepubescent children in the course of his duties as an employee and instructor.

29. A review of the SwapX app and other media files on the Samsung cell phone has shown that non-CSAM photographs were taken of minors, including of minors who appears to be between the ages of eight (8) and thirteen (13), at either [redacted], gymnastics facilities, or other locations. Based on my training and experience, my observations of my review of MELLO's cell phone, and my knowledge that MELLO was a performer at [redacted] and was an instructor at gymnastics and cheerleading facilities, I believe that MELLO took these non-CSAM photographs of real children while at these facilities.

30. From my review of the images from MELLO's cell phone, it appears that photographs of the real minors who appear to be between the ages of eight (8) and thirteen (13) at [redacted], gymnastics facilities, or other locations, were submitted by MELLO to SwapX and/or other AI apps or websites discussed herein, to produce explicit AI-generated images and videos of the children, who then appear fully nude and/or performing sexual acts on male genitalia (such as oral-genital sex and genital-genital sexual intercourse), including on MELLO's genitalia. From my review of the cell phone to date, it appears that the primary focus in the AI-generated media is on prepubescent minor females.

31. In my review of MELLO's Samsung cell phone, I have also viewed images of MELLO, both clothed and nude, including several up-close images of his erect penis in different positions

and that are GPS-tagged to his prior residence at Pacheco Drive, North Smithfield, RI.

32. As described herein, in some of the AI-generated images and videos, depictions of MELLO, fully nude and with an erect penis, appear to have been edited and/or superimposed into the media depicting the minor children, such that MELLO appears to perform explicit sexual acts on the minor female children and/or the minor female children appear to perform sexual acts on him (such as oral-genital sex and genital-genital sexual intercourse). Some of these images depict minors who are known to be real children.

33. During my review of the extracted Samsung phone data using Cellebrite software, I have located three images of MV1, unclothed from the waist up, in the [redacted] bathroom, looking at the camera with a shocked expression. These images were found using a search of the device's timeline, which shows data and device actions that occurred on the cell phone in a chronological date and time format. These images of MV1 contain data that log the date and time when the images were taken. With this date and time data, the images of MV1 were located around the date and time of when the incident reportedly occurred by filtering for image and video files pertaining to the date and time of the reported incident. The filepath for all three photos of MV1 contained the phrase "com.sprayjoy.app.swapx.pro," which I know, from my training and experience, indicates that the images had been taken with, edited, and/or saved using the application SwapX Pro.

34. During my review of the extracted cell phone phone data, I also observed that the images of MV1 were found within the same timeframe of other non-explicit and explicit images of other females that appear to be minors. I have confirmed that these depicted minors are real children.[9]

[9] I believe that the other minors are from the same [redacted] as MV1 because some of the clothed images of MV1 in the [redacted] common areas were located in the same timeframe as the other female minors in what appeared to be the same setting. Additionally, the [redacted]

In some of the photographs, the other real minor females appear to be wearing regular clothing. However, in other photographs recovered from the Samsung cell phone, MV1 and the other real minor females appear to be fully nude and have male genitalia added to be near their bodies. In other images, real, identified minor females, including MV1, are depicted and appear to perform explicit sexual acts on male genitalia, specifically oral-genital sex, that are believed to be superimposed images of MELLO's own male genitalia. Based on my training and experience and the training and experience of other investigators, I believe the images in which the known, real minor females were nude were generated via the SwapX app. The file names have SwapX in the file identifiers. These same image files also had associated video files with photograph-preview thumbnails created around the same timeframe as explicit photos of MV1 in the bathroom that were taken by MELLO at [redacted].

35. Running a preliminary search of the term "SwapX" across images and videos in the MELLO Samsung cell phone reveals approximately 953 videos and 2,881 images. A small number of these images/videos that resulted from that search term are of the app media itself (app graphics, internal ads, etc). Other media contains the original, clothed, known, minor female photographs. The overwhelming majority of such media depict explicit sexual content in which minor females, including minor females known to be real minors, appear to have their likeness used in numerous AI-generated photos and videos.

36. A search of MELLO's cell phone's "Applications Usage Log" shows phone actions such as the opening and closing of applications, what application is brought into focus on the screen or sent into the background, and the copying of text. I further focused this search by the "Action"

---

director was able to identify the non-CSAM images of victim minors as real, active members of the [redacted].

column to only produce results for the "Copy" action. That focused query showed entries from the "Samsung Clipboard," which revealed saved 103 text results that the telephone user (MELLO) "copied" on his phone previously. The overwhelming majority of the results appear to be explicit AI-prompts describing sexual actions, some of which are described below. This majority of the saved / copied text results appear to have been used within the SwapX Pro app since they are correlated with the identifier "com.sprayjoy.app.swapx.pro," which is an identifier that I know is associated with the SwapX app. Based on my training and experience, and work on this investigation, I believe that MELLO copying text to use later, as a "paste" into an AI application prompt or text entry area.

37. The following are examples from the Samsung cell phone extraction of the Samsung showing the use of copied prompts, that appear to have been used on the SwapX AI platform, dated 3/21/26.

a. There are two images from 3/21/26 for which the prompts are documented. One image is a mother and her prepubescent daughter in formal dress attire, standing together. The other image is of a different mother and her prepubescent daughter in gymnastics and cheerleading attire. This minor is believed to be from [redacted], based on observations of her clothing, but that has not yet been confirmed.

b. With respect to these two images, it appears the Samsung user (MELLO) entered the following prompt: "*Keep the facial features of the subject in the reference image unchanged, and remove her clothes*." From the resulting image, the AI application appears to have removed the clothes of the females portrayed in the image.

c. The Samsung user (MELLO) then entered the following prompts: [omitted]

*watching proudly*" ; "*the girl on the left puts the penis in her mouth and gives it a sloppy blowjob. the girl on the right is watching proudly*."

d. The two images then appear to have been altered, into sexually explicit videos specifically having the prepubescent child in each photo performing oral sex on MELLO's edited-in erect penis with the mothers watching the action.

From my review of this material, it appears that the Samsung user (MELLO) was editing with the use of AI to create sexually explicit videos of a minor performing sexual acts on MELLO's erect penis that the user edits into the images.

38. Other examples of the telephone user's (MELLO) copied prompts from 3/29/26 include the following:

a. In this instance, the telephone user (MELLO) edited clothed photos of real, known children, specifically, MELLO's fellow prepubescent female [redacted] performers and generated AI pornography of them.

b. The telephone user (MELLO) edited in a portion of MELLO's naked body with an erect penis for the apparent purpose of using AI-prompts to make them perform sexual acts on MELLO's erect penis.

c. The telephone user (MELLO) unclothed a prepubescent female using the prompt "*Keep the facial features of the subject in the reference image unchanged, and remove her clothes revealing her small nipples*." This action is followed by the prompt "*she holds her gaze and doesn't look away. she opens her mouth and slides the penis down her throat and gives oral sex to it" shortly after*.

39. Other examples of the copied prompts from the telephone user (MELLO) from 4/11/26 include the following.

a. In this instance, the user is using the facial likeness of a prepubescent female, who is a member of a gymnastics studio MELLO was employed at,[10] and generating her face to be on a nude female body in front of MELLO's erect penis in what appears to be a blue tiled shower setting.

b. The telephone user's (MELLO) prompt reads "*The video then jumpcuts to the same woman now receiving a facial from a man's penis. She has gigantic breasts. She is lying on her back. The cum shoots all over her face. The man's hand holds his erect penis masturbating his penis and shooting the thick white cum directly onto her face, forehead, eyes, cheek and mouth. The thick white cum slowly drips down her onto her body. an explosion of thick white cum blasts her face. she looks directly at the camera throughout the video*."

40. The telephone user (MELLO) also appears to use Grok to generate short videos or images of fictitious females who appear to be prepubescent, and whose images are believed to have been created by MELLO using AI platforms, such as Grok, in what I believe a preferred setting and/or clothing chosen by MELLO. These generated videos and images are saved with the words "ai.x.grok" in the filepath, showing they are linked to the Grok application. An example of copied prompts from 4/12/26 shows the telephone user (MELLO) using Grok to generate multiple short videos of these unknown females who appear to be prepubescent in similar clothing. The prepubescent females are typically wearing jean shorts and a tight white tank top with the nipples clearly seen through the clothing. The videos depict these prepubescent females beginning to undress, however they do not appear to reveal any nude portion of themselves.

---

[10] This prepubescent minor is believed to be a real minor based on observations of images of her on the [redacted] Facebook page. In our investigation, we have not yet identified her by name.

MELLO appears to then edit these images of the unknown females in some instances with faces of known prepubescent females. MELLO uses AI to swap the faces of these fictitious minors in whichever scene they were generated in to now have the faces of known minors. MELLO then uses AI to create images of the known minors performing sexually explicit actions on male genitalia, which are believed to be MELLO's own genitalia.

41. Examples of MELLO's use of Grok to create images using minors that have been identified as real children include the following images that were created, according to file data on various dates in January 2026. I have observed multiple images that are AI-generated and watermarked with the word "Grok" and the Grok logo in the bottom right corner. Grok AI images include, amongst other examples, a January 6th, 2026 at 3:31:35 PM image in which a prepubescent female victim is on her knees facing the camera dressed in a black thong with black tape over her nipples with no further clothing. The image of this prepubescent female victim is edited into various sexually graphic images and videos, to include sexual acts of genital-genital intercourse and genital-oral intercourse. Through the investigation, we have identified this prepubescent female as a real child from the [redacted],[11] a facility where MELLO worked as a gymnastics coach.

42. From my review of the Samsung cell phone, it appears that MELLO has also used the website "aifaceswap.io" in the process of generating/producing CSAM. From my review of the Samsung cell phone, it appears that MELLO used this site to swap the faces of depicted subjects to faces of persons known to him, such as prepubescent minors with whom he appears to have in-person contact. An example of MELLO's use of AIFaceSwap includes the following: on April

[11] This prepubescent minor is believed to be a real minor based on observations of images of her on the [redacted] Facebook page. In our investigation, we have not yet identified her by name.

12, 2026 around 12:40:25 AM(UTC-4) MELLO face swapped known, real prepubescent female minors' faces (from dance and gymnastics facilities MELLO attended or was employed at) onto images of nude females in a pool area setting. The nude females appear to be generated from Grok based on the file path, and then MELLO appears to have swapped the adult faces using aifaceswap.io to faces of known prepubescent minor females he chose. MELLO also appears to have edited his own erect penis into the images for SwapX video generation of him performing explicit penis-vagina sexual acts on the prepubescent minors later on.

43. "File Downloads" and "Web History" for AIFaceSwap show URL links MELLO appears to have used to download a generated image he submitted to the site. When searching "Downloads" on MELLO's phone, there are 699 instances in which MELLO successfully downloaded photos and video content from aifaceswap.io between the dates of December 30th, 2025 to April 14th, 2026. The “Web History” also logs instances when MELLO appears to sign into the website, which then unlocks additional advanced features offered by “aifaceswap.io” (such as longer videos and higher resolution quality results).

44. From my training and experience and based on my knowledge of the AI platforms used by MELLO and his activity with these AI platforms, I believe that after MELLO entered the prompts with the non-nude / non-sexually explicit photographs of the real minors, the created image was altered / edited on the AI provider’s platform and returned to MELLO / received by MELLO, using the internet, a means and facility of interstate and/or foreign commerce.

*CSAM of Other Real Minors (Non-AI Produced)*

45. In the review of an external hard drive that belonged to MELLO and which was seized from his residence during execution of the search warrant on April 15, 2026, I have found

backup copies of the same CSAM located on MELLO's cell phone that he appears to have produced with AI and other editing applications, using the identified children from [redacted] and [redacted]. In addition to the CSAM material that MELLO created using AI tools, investigators also found known CSAM images of other minors, which were located in a folder titled "myyearbook."

a. One image titled "49585_photo5478_123_1170lo.jpg" depicts a nude minor female sitting on the floor with her legs spread, exposing her vagina.

b. Another image titled "49594_photo1460_123_827lo.jpg" depicts a nude minor female bending over in front of a mirror. The nude minor female is inserting her finger into her anus and her vagina is exposed.

These "known" images are part of the National Center for Missing and Exploited Children (NCMEC) series titled "Deer Corn."

46. On May 12, 2026, MELLO's wife contacted me, inquiring about the investigation and asking for the release of her laptop. In my conversation with MELLO's wife, she informed me that she was filing for divorce from MELLO and that she had questioned MELLO after his LPD arrest about the devices that were seized, namely the black portable hard drive listed on the search warrant seized item list left at the residence. She stated she was unaware of the portable hard drive that was taken, which MELLO confessed that he kept that hard drive a secret from her. He explained to her that it contained similar voyeurism and pornographic data dating back to when he was in high school.

*Prior Voyeurism Activity By MELLO*

47. During the May 12, 2025 conversation with MELLO's wife, she informed me of 2024 incident in which the police responded after MELLO took a video of a minor in Myrtle Beach,

South Carolina, while she and MELLO were on vacation at a hotel in Myrtle Beach, South Carolina. I obtained the police report from Myrtle Beach PD for this incident, which detailed that MELLO was caught filming a 16-year old female in the hotel gym. According to the report, "[MELLO] stated that he had a problem and when he sees something sexy, he has to take a picture or video of it" and claimed that he has searched for help for this [taking videos] in the past.

*Conditions of Release on State Case*

48. As stated above, MELLO has been charged in the State of Rhode Island with Video Voyeruism in violation of RIGL § 11-64-2. (Case No. 32-2026-02532). On April 15, 2026, MELLO was release with bail conditions, to include no unsupervised contact with minors, no trespass order at a listed address, refer to pretrial services unit, and no contact order with the complaining witness.

49. In this investigation, I have learned that MELLO has attempted to be in contact with and in the vicinity of children since his release on bail.

50. In October 2026, an employee of [redacted] in Seekonk, MA informed me that parents have reported to [redacted] personnel that on diverse dates in October 2026 since MELLO's arrest, MELLO has been sending friend requests on social media to multiple children who participate in programs at [redacted] in Seekonk and previously had MELLO as an instructor. As stated herein, MELLO was a gymnastics coach at [redacted] in Seekonk until his arrest. One of the children to whom MELLO sent a friend request was 15 years old. I have viewed a screen shot of the Instagram profile that sent the friend request to this child, and that profile is sent from an account with the profile name "Joe Mello III" and has a profile picture with MELLO's image (with his dog). I know from my review of MELLO's cell phone that Instagram account is one of

the instagram accounts on his Samsung cell phone.

51. In August 2026, I learned that MELLO had been observed in North Smithfield at a "Kids Day in the Park" event in July 2026. A photograph of the event, which had been posted on the North Smithfield Police Department's Facebook page but which has since been removed, showed MELLO at the July 2026 event. In the image, MELLO could be seen walking a dog, near children and North Smithfield Police officers. A person who attended the event and who knew MELLO prior to his arrest relayed the following information to me: She saw MELLO enter the Kids Day event with his dog and later saw MELLO laying on the ground with his dog, approximately 10-15 feet from a bubble machine, which was approximately 20 feet from a playground. She said that while in this position, MELLO was holding his phone up and pointing it in the direction of children at the event. She advised me that she attempted to alert police without causing a scene, but she believes that MELLO saw her signaling his presence to others because he left the area.

52. Based on these reports, I believe that MELLO is in possession of at least one electronic device. I further believe that, based on the information described herein and MELLO's history and repeated efforts to alter images of children into CSAM, that there will likely be images of children on any cell phone or digital device in his possession and that there may be evidence that he has used any such devices to create CSAM using real children that he photographed.

## REQUEST FOR SEALING

53. I further request that the Court order that all papers in support of this application, including the affidavit, complaint, arrest warrant, and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to

seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## ELECTRONIC DEVICE USAGE IN FURTHERANCE OF CRIMES AGAINST CHILDREN

54. Your affiant is aware through investigative experience, education, and training that there are certain characteristics that are generally common to offenders who access, send, distribute, exhibit, possess, display, transport, manufacture, or produce material which depicts minors engaged in sexually explicit conduct, or who engage in sexually explicit communications with minors. Said material includes, but is not limited to, photographs and videos stored electronically on computers, digital devices, or related digital storage media.

55. Such offenders may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have that stem from viewing children engaged in sexual activity or in sexually suggestive poses, whether in person, in photographs or other visual media, or from literature describing such activity.

56. Such offenders may collect sexually explicit or suggestive materials in a variety of media, including digital photographs, videos, or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to facilitate contact offenses – that is, to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

57. Such offenders almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives,

photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location, like their electronic devices. Individuals who have a sexual interest in children or images of children typically retain their cache for many years.

58. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a "SD card," computer or surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the offender's residence, on his phone, inside the offender's vehicle, or, at times, on his person, to enable the individual to view the CSAM images, which are highly valued to them.[12]

59. Such offenders have been found to download, view, and then delete CSAM on their computers or digital devices on a cyclical and repetitive basis, presumably to avoid criminal liability. Importantly, as described in more detail below, evidence of such activity, including deleted CSAM, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[13]

---

[12] *See United States v. Morales-Aldahondo*, 524 F.3d 115, 117-119 (1st Cir. 2008) (3-year delay between last download and warrant application not too long, given affiant testimony that consumers of child pornography value collections and thus often retain them for a period of time, and consumers who use computers to access child pornography are likely to use computers to store their collections).

[13] *See United States v. Seiver*, 692 F.3d 774, 775-776 (7th Cir. 2012) (in context of staleness challenge, collecting and agreeing with cases from the 4th, 5th, 6th, and 9th Circuits that acknowledge the ability of forensic examiners to recover evidence of child pornography even after such files are deleted by a user).

60. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or files on digital devices or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers or electronic devices, they can easily transfer the data from an old computer or device to a new computer or device.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer or device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer or device storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer or device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer or device users typically do not erase or delete this evidence because special software is usually required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

61. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how any electronic devices located on the SUBJECT PERSON were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on any electronic devices located on the SUBJECT PERSON because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to photograph minor children and create sexually explicit material involving the children, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for

evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

62. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of any electronic devices located on the SUBJECT PERSON consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**BIOMETRIC ACCESS TO DEVICES**

63. This warrant permits law enforcement to compel MELLO to unlock any electronic devices (device(s)) found on his person requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the

user's irises. The device can then be unlocked if the infrared-sensitive camera detects the

registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. Your Affiant has reason to believe that one or more digital devices will be found during the search of the SUBJECT PERSON. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain

Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. Due to the foregoing, if law enforcement personnel encounter any electronic devices found on the person of MELLO for which they have a reasonable belief belong to MELLO that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of MELLO to the fingerprint scanner of any electronic devices found on the person of MELLO; (2) hold any such devices found on the person of MELLO and activate the facial recognition feature; and/or (3) hold the any electronic devices found on the person of MELLO in front of the face of MELLO and activate the iris recognition feature, for the purpose of attempting to unlock the electronic devices in order to search the contents as authorized by this warrant.

The proposed warrant does not authorize law enforcement to compel MELLO to state or otherwise provide the password that may be used to unlock or access the electronic devices found on the person of MELLO. Moreover, the proposed warrant does not authorize law enforcement to compel MELLO to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access any devices found on MELLO.

## SEARCH WARRANT RETURN

64. Your Affiant is aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a notation of only whether an extraction was obtained.

## CONCLUSION

65. Based on the foregoing, I believe there is probable cause

a. for a complaint and arrest warrant to issue for JOSEPH MELLO for violations of the SUBJECT OFFENSES; and

b. to believe that evidence of the SUBJECT OFFENSES, as described in Attachment B, will be located on MELLO, as described in Attachment A.

Sworn to under the pains and penalties of perjury,

[signature]

Nicholas Nunes
Task Force Officer
Homeland Security Investigations (HSI)

Attested to by the applicant in accordance with the requirements ofFed. R. Crim. P. 4.1. by: **Telephone** (specify reliable electronic means)

| | |
|---|---|
| November 6, 2026 | [signature] |
| Date | Judge's Signature |
| Providence, Rhode Island | U.S. Magistrate Judge Amy E. Moses |
| City and State | Printed Name and Title |